## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                      **NO. 18-49**

**TORREY SCOTT**                                **SECTION "D"(4)**


### ORDER

Before the Court is the Motion to Suppress Evidence and Memorandum in Support filed by Defendant Torrey Scott.[1] The Motion is opposed, and the Government has filed a Memorandum in Opposition.[2] The Court held a hearing on the Motion on September 12, 2019. After careful consideration of the parties' memoranda and the testimony elicited at the hearing, the Court DENIES the Motion.

### I.      FACTUAL BACKGROUND

On March 1, 2018, Torrey Scott was charged in a four-count Indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts One and Two), possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924 (c)(1)(A) (Count Three), and possession with intent to distribute quantities of heroin and methylenedioxymethamphetamine, both Schedule I drug controlled substances, and

---

[1] *See* R. Doc. 47.
[2] *See* R. Doc. 50.

cocaine hydrochloride, a Schedule II drug controlled substances, all in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count Four). Defendant was arraigned and pled not guilty.

On August 16, 2019, Defendant filed the present Motion to Suppress Evidence.[3] The Government filed its Response Memorandum[4] on August 20, 2019, and an evidentiary hearing[5] was conducted on September 12, 2019.

The testimony presented at the evidentiary hearing revealed that a known confidential informant had advised law enforcement that a person by the name of "Torrey" was selling drugs out of a barber shop located at 4006 Eden Street in New Orleans.[6] Sergeant Dwayne Bastion of the New Orleans Police Department testified that the informant, who had provided reliable information in the past which had resulted in arrests and convictions, informed him that "Torrey" was selling "crack and heroin" from that location.[7] The informant also gave a physical description of the individual known as Torrey.[8]

Sergeant Bastion testified that law enforcement set up a surveillance and saw several males speak to someone from inside a gray Infiniti vehicle that was parked outside of the barber shop.[9] Then, one of the individuals would go to a gray Infinti

---

[3] *See* R. Doc. 47.
[4] *See* R. Doc. 50.
[5] *See* R. Doc. 68.
[6] Transcript Draft of Evidentiary Hearing at 3-4, United States v. Scott, Crim. No. 18-49 (September 12, 2019).
[7] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 4-6.
[8] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 5. "[T]he informant described the person as a black male, approximately 40 years old, bald-headed, dark-skinned." *Id.*
[9] *Id.*

vehicle, speak to an individual, and enter the barber shop by way of a buzzer system.[10] Once the individuals gained entrance to the shop, which appeared closed to the general public, they remained inside the shop only a matter of minutes, then exited.[11] Sergeant Bastion testified that none of the men looked clean-shaven upon exiting or as though they had received a haircut during their minutes in the shop.[12] The officers watched at least three individuals do the same thing—namely, speak to someone outside of the barber shop, get buzzed into the barber shop, and, after only a couple of minutes, exit the barber shop.[13] Sergeant Bastion then saw Defendant Torrey Scott exit the shop after the third male exited.[14] As Mr. Scott exited the shop, he looked up and down the street, went to an Infinti car that had been parked outside the shop, removed a red crate from the truck of the Infinti, then, looking up and down the street, placed the crate in the rear passenger side of a truck.[15] Mr. Scott then entered the truck and drove away.[16] Based on the information received from his reliable confidential informant, Sergeant Bastion believed he had witnessed possible drug trafficking and communicated that information to fellow officers.[17]

On cross-examination, Sergeant Bastion confirmed that he was not able to see what occurred inside the barber shop since the door was closed after each individual

---

[10] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 5-9.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 9.
[15] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 9-10.
[16] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 10-11.
[17] *Id.*

was buzzed in.[18] He testified that he saw the defendant buzz in one individual to the shop but did not know who allowed the others to enter.[19] He also testified that he did not arrest anyone either entering or leaving the shop that day, nor did he request a search warrant for the shop.[20]

Detective Kyle Hinrichs of the New Orleans Police Department testified that he followed the defendant as he drove away from the barber shop in his truck and pulled him over for an "investigatory stop" based on the information that had been provided to him by the surveillance officers, including the confidential informant information.[21] After pulling Mr. Scott's vehicle over, the police officer had the defendant exit the vehicle, and the officer entered the vehicle to move it out of the traffic.[22] Detective Hinrichs saw the red milk crate, which he described as an open-type crate, without a top, that could be seen through both openings on the sides as well as from the top since it did not have any cover on it, in the back of the truck on the rear seat.[23] Detective Hinrichs testified that sitting inside the crate in plain view was an "obvious gun case."[24] On re-direct, it was elicited that the Detective Kyle

---

[18] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 13-15.

[19] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 13-14.

[20] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 15-17.

[21] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 22-25.

[22] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 25.

[23] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 25. "I . . . immediately saw on the backseat, a plastic red milk crate that had two gun cases that were obvious there in plain view." *Id.* "I see very clearly in the backseat, where I was informed by Sergeant Bastion that the defendant had placed the object, and I could clearly see. It didn't even take any searching." Transcript Draft of Evidentiary Hearing, *supra* note 6, at 36.

[24] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 25, 26, 37, 42.

Hinrichs' experience from law enforcement during his 27 years on the force allowed him to recognize the metal case, sitting inside the open red crate, as a gun case.[25]

Detective Hinrichs asked Mr. Scott if he had paperwork for the firearms within the metal case: two .40 caliber Glock semiautomatic pistols.[26] According to Detective Hinrichs, Mr. Scott initially denied having guns in the truck and then said the firearms may belong to his brother.[27] The firearms were confiscated and booked as property, and Mr. Scott was advised that he could retrieve them with the proper paperwork.[28] Mr. Scott was arrested for driving with a suspended driver's license, but he was not booked with being a felon in possession of a firearm.[29] Detective Hinrichs testified that a call-in request for a background check on Mr. Scott failed to reveal any prior conviction.[30] Mr. Scott was found with more than $2,000 in smaller bills in different denominations in his front pants pockets.[31] No drugs were found in the truck.[32] Detective Hinrichs testified that he only determined two days later that Mr. Scott was a convicted felon.[33] At that time, he changed the paperwork to reflect that the firearms were "evidence" rather than "property" as they had originally been

---

[25] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 22, 42.
[26] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 26.
[27] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 26-27.
[28] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 27-28.
[29] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 26-28; 32.
[30] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 26-27.
[31] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 41-43.
[32] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 40.
[33] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 27-28.

inventoried.[34] He also executed an arrest warrant for Mr. Scott's arrest for a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), being a felon in possession of a firearm.[35]

Detective Andrew Roccaforte of the New Orleans Police Department testified that on November 18, 2016, he and other law enforcement officers went to execute the arrest warrant which had been issued for Mr. Scott.[36] Prior to the arrest, the officers set up a surveillance of 7200 Washington Avenue, as they had witnessed Mr. Scott enter that residence using a key during previously conducted surveillance.[37] After approximately one hour of surveillance, at about 9:00 am, Mr. Scott emerged from a rear door with a young child and entered a gray Infinti vehicle parked outside of the residence.[38] He was arrested pursuant to the arrest warrant and subsequently searched.[39] The search revealed approximately 20 grams of crack cocaine and approximately 10 grams of heroin in Mr. Scott's right front pants pocket.[40] Mr. Scott subsequently yelled to a female companion who had come out of the residence at 7200 Washington Avenue to "lock the gate" and make a phone call.[41] The officers instructed the female to open the gate, and she refused.[42] The officer testified that the officers believed that drugs were in the house that could be destroyed.[43] The officers pried open the gate to secure the residence while taking steps to obtain a search warrant.[44]

---

[34] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 28-30.
[35] *See* R. Doc. 70-4; Transcript Draft of Evidentiary Hearing, *supra* note 6, at 30.
[36] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 45-46.
[37] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 54, 56.
[38] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 47, 65.
[39] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 46-48.
[40] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48.
[41] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48-49.
[42] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 49.
[43] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48-50.
[44] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 49-50.

Detective Roccaforte testified that the officers entered the home to make certain that no one else was present and left one officer in the home with the female occupant and children while the remaining officers exited to obtain the search warrant.[45] He testified that no search of the home took place until the search warrant was returned approximately two hours later.[46] Upon cross-examination, the officer testified that the officers were in the home approximately "a minute, minute and a half" to make certain that no one else was present inside and to secure the residence.[47]

The search warrant for the residence at 7200 Washington Avenue was signed at 11:08 a.m. and a search warrant for the gray Infinti vehicle was signed at 11:15 a.m.[48] The officers returned to the scene with the warrants and searched the residence.[49] Detective Roccaforte testified that no law enforcement officer searched the residence until the officers returned with the signed search warrant.[50] At some point after the officers returned with the signed warrants, Mr. Scott indicated to the officers that he wanted to show them where the evidence was located.[51] Mr. Scott did so, and the police seized, among other items, $14,271 dollars, 400-500 grams of heroin, 500 ecstasy pills, two revolvers, and one Diamondback assault rifle.[52]

In addition to the testimony of the three law enforcement officers, the Government submitted the two search warrants as well as the arrest warrant into

[45] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 50.
[46] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 50, 63.
[47] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 61.
[48] *See* R. Docs. 70-1, 70-2.
[49] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 50-53.
[50] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 63.
[51] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 52.
[52] *See* R. Doc. 70-3; Transcript Draft of Evidentiary Hearing, *supra* note 6, at 52-53, 63-64.

the record for purposes of the evidentiary hearing.[53] The defense did not present any

testimony or any exhibits into the record during the hearing, though it did conduct

extensive cross-examination of the witnesses.

In its Motion to Suppress Evidence, the defendant argues that the police

"acting only on conjecture, formulated a traffic stop" of Mr. Scott's vehicle:[54]

> By stopping Mr. Scott's vehicle without articulable facts for reasonable
> suspicion of a crime, N.O.P.D. officers made an unlawful traffic stop.
> Furthermore, the officers compounded their error by nevertheless
> exceeding the scope of their unlawful traffic stop by conducting a
> nonconsensual and unwarranted search of the vehicle without probable
> cause.

R. Doc. 47-1, p. 4. The defendant moves to suppress the weapons confiscated from the

vehicle as a result of that stop.[55]

Regarding the evidence seized following Mr. Scott's arrest, the defense argues

that the police lacked authority under an exigent circumstances rationale to search

the residence without a warrant.[56] Indeed, the defense's entire basis for suppression

of the evidence seized after Mr. Scott's arrest is premised on the apparently mistaken

belief that "government officers entered and search Mr. Scott's residence at 7200

Washington Avenue without a warrant and with no justification."[57] The Court notes

that, upon inquiry from the Court during the hearing, defense counsel confirmed that

they were in possession of a copy of the search warrant. However, the defense did not

---

[53] *See* R. Docs. 70-1, 70-2, 70-4.
[54] R. Doc. 47-1, p. 4.
[55] *See* R. Doc. 47-1.
[56] *See* R. Doc. 47-1, pp. 9-13.
[57] R. Doc 47-1, p. 13.

present any evidence either in its Memorandum or in the evidentiary hearing to attack the search warrant.

## II.    LEGAL STANDARD

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[58] The Fourth Amendment imposes a standard of reasonableness upon law enforcement officers to prevent arbitrary invasions of the privacy and security of citizens.[59] The United States Supreme Court "has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions."[60] "While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the [G]overnment."[61] The burden shifts to the Government when a defendant shows that he was subject to a search without a warrant.[62] The Government then must prove the legality of the stop and the warrantless search by a preponderance of the evidence.[63]

---

[58] *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. CONST. amend. IV).
[59] *Hunt,* 253 U.S. at 230 (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)).
[60] *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)).
[61] *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (internal citation omitted).
[62] *Id.*
[63] *United States v. Matlock*, 415 U.S. 164, 177, n. 14 (1974).

## A. *Seizure of the Weapons in the Truck During the March 15, 2016 Traffic Stop.*

The defendant argues that the officers did not have articulable facts that would lead to an objective belief of reasonable suspicion that a crime was afoot.[64] An officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonable warrant a particular intrusion.[65] Inarticulable hunches and simple good faith on the officer's part will not suffice.[66] "Reasonable suspicion, however, does not have to be based on a personal observation. It can be based on information provided by a confidential informant, if the information possesses 'an indicia of reliability.'"[67]

In *Michigan v. Long,* 463 U.S. 1032 (1983), the Court applied the principles of *Terry* to automobile searches. In *Long,* two police officers noticed a vehicle was being driven erratically and at an excessive rate of speed in a rural area late at night.[68] The officers stopped to investigate.[69] The defendant, David Long, appeared to be under the influence of drugs or alcohol.[70] At one point, Mr. Long began to walk

---

[64] *See* R. Doc. 47-1, p. 4.

[65] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

[66] *Terry*, 392 U.S. at 21-22. (stating, "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.") *Id.*

[67] *United States v. Roch*, 5 F.3d 894, 898 (5th Cir. 1993) (internal citation omitted).

[68] *Michigan v. Long,* 463 U.S. 1032, 1035 (1983).

[69] *Id.*

[70] *Michigan,* 463 U.S. at 1036.

toward the open door of his vehicle.[71] The officers followed him and observed a hunting knife on the floorboard of the car.[72] After seeing the knife, the officers subjected Long to a protective pat down, which revealed no weapons.[73] While one of the officers remained with the Mr. Long outside of the vehicle, the second officer entered the vehicle and found a pouch containing marijuana sticking out from the armrest.[74] The United States Supreme Court held that

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long,* 463 U.S. 1032, 1049 (1983) (quoting *Terry v. Ohio*, 329 U.S. 1, 21 (1968)). Relying on *Terry* and *Horton v. California*, 496 U.S. 128 (1990), the Fifth Circuit has held a plain view seizure requires that (1) the police's initial intrusion be supported by a warrant or recognized exception to the warrant requirement, and (2) the incriminating character of the object seized be immediately apparent.[75]

B. *Seizure of the Evidence Following Mr. Scott's Arrest on November 18, 2016.*

It is well established that a law enforcement officer has a right to search an individual pursuant to a lawful arrest.[76]

---

[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *United States v. Coleman,* 969 F.2d 126, 131 (5th Cir. 1992)
[76] *See e.g., Maryland v. King*, 569 U.S. 435, 456 (2013) (stating that "'[t]he standards traditionally governing a search incident to lawful arrest are not . . . commuted to the stricter *Terry* standards.' *Robinson,* 414 U.S., at 234, 94 S.Ct. 467. Nor are these interests in

*C. Securing the Residence While Awaiting the Search Warrant.*

It is also well established that law enforcement may take reasonable and minimal steps to secure a residence or location in exigent circumstances to prevent the destruction of evidence while the law enforcement officers obtain a search warrant.[77] "Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry. Exigent circumstances generally exist where there is a risk that the officers or innocent bystanders will be endangered, or that evidence will be destroyed."[78] The courts consider several factors in deciding whether exigent circumstances exist at the time of a warrantless entry, such as

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic.

*E.g., United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995); *United States v. Vega*, 221 F.3d 789, 800 (5th Cir. 2000) (citing *United States v. Morales*, 171 F.3d 978, 982

---

identification served only by a search of the arrestee himself. '[I]nspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity.'"); *United States v. Robinson*, 414 U.S. 218, 226 (1973) (stating that in *Cupp v. Murphy*, 412 U.S. 291, 295 (1973)), "we again reaffirmed the traditional statement of the authority to search incident to a valid arrest.").

[77] *See State v. Cortez*, 98 So. 3d 382 (5th Cir. 2012); *See United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997). (stating, "Although a warrantless entry into a home is presumptively unreasonable, entry may be justified by exigent circumstances. *United States v. Rico,* 51 F.3d 495, 501 (5th Cir.), *cert. denied,* 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995) (*citing United States v. Richard,* 994 F.2d 244, 247 (5th Cir.1993)). The government bears the burden of proving that an exigency existed. *Id.* (*citing United States v. Thompson,* 700 F.2d 944, 946 (5th Cir.1983)).")

[78] *United States v. Blount*, 12 F.3d 831, 837 (5th Cir. 1997).

(5th Cir. 1999)); *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (citing *United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993) (quoting *United States v. Thompson*, 700 F.2d 944, 948 (5th Cir. 1983))). Further, courts have looked to a "reasonable person" standard to determine if an officer's warrantless entry under exigent circumstances, was justified. The Court may take into consideration the officer's experience, knowledge, and observations at the time to determine whether the officer's actions were reasonable.[79]

## III.   ANALYSIS

The Court analyzes the searches and seizures of evidence at issue separately below.

### A. *Seizure of the Weapons in the Truck During the March 15, 2016 Traffic Stop.*

The initial question for the Court is whether the officers' stop of the defendant in this vehicle was supported by reasonable suspicion. In looking at the totality of the circumstances, the Court notes that a confidential informant had advised law enforcement that an individual with a description that matched the defendant, including the first name Torrey, was selling "crack and heroin" out of a certain location and provided the address of that location.[80] Sergeant Bastion testified that the confidential informant (1) was reliable; (2) had been used in the past; (3) had

---

[79] *See United States v. Rico*, 51 F.3d 495 (1995).
[80] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 3-4.

given information that had previously led to arrests and convictions; and (4) had never been deceptive with law enforcement.[81]

Upon setting up surveillance of the location provided by the confidential informant, law enforcement was able to corroborate that a person matching the description—and later found out to indeed be named Torrey Scott—was one of the people at the premises and that the premises was in fact a barber shop as had been advised. The police officers testified that they witnessed several individuals communicating with someone outside the barber shop, then being buzzed into a barber shop which was closed to the public, staying for only a few minutes, and exiting the barber shop.[82] None of the individuals looked as though they had received a haircut or shave during the time they were in the barber shop.[83]

The police officers testified that they estimated the individuals stayed in the shop one to two minutes, testifying in response to the question of how long the individuals stayed in the barber shop, "That—everything was a matter of within a minute or two at the most. It was in and out.[84] In addition, the officers then saw Mr. Scott exit the barber shop and go to a vehicle where several of the individuals has also stopped.[85] After pulling something out of the trunk of the vehicle, he looked up and down the street suspiciously before placing that container into his vehicle and driving away.[86] As testified to by Sergeant Bastion,

[81] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 4-5.
[82] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 7-10.
[83] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 8-9.
[84] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 9.
[85] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 9-11.
[86] *Id*.

> Well, he was—the whole time he was moving he was looking around being aware of what was going on around him, and then it was placed on the passenger side floorboard. . . Along with him going into the trunk of the vehicle and looking around, being cautious about his movement, and then walking over to that other truck and putting it in there, that was real suspicious to us. We thought that could have possibly been narcotics that was being used or transported.

Transcript Draft of Evidentiary Hearing at 10-11, United States v. Scott, Crim. No. 18-49 (September 12, 2019). The Court finds that the Government has sustained its burden in proving that the officers had reasonable suspicion to believe that they were witnessing drug transactions, justifying the investigatory stop of Mr. Scott's vehicle. The Court bases this conclusion largely on the officers' testimony, which the Court found highly credible.

Once Mr. Scott's vehicle was stopped and he exited the vehicle, the officer testified that he entered the vehicle in order to move it out of traffic as the stop had occurred at about 5:00 p.m. at a busy city intersection. Detective Hinrichs testified, "The street was very busy. It was very busy with vehicle traffic. Therefore, once the vehicle—once we had a stop on the vehicle, and I instructed the defendant to exit, almost immediately then we relocated the truck."[87] He further testified "I then began to conduct of the search of the interior, and immediately saw on the backseat a plastic red milk crate that had two gun cases that were obvious there in plain view."[88] The Court finds that Detective Hinrichs was credible when he testified that the open milk crate, which he described as not having a top and having holes in the side so that the

---

[87] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 23.
[88] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 25.

contents could be easily viewed, was in plain view of the officer. Specifically, the officer testified:

> Q: What kind of carton was this? What kind of a container?
> A. Similar to like a milk crate.
> Q. Did it have a top on it?
> A. No, sir.
> Q. Was this visible from outside of the truck when you look in?
> A. Yes, sir.
> Q. And where was it again?
> A. On the rear seat of the passenger side, sir.
> Q. Could you see inside the carton, the crate?
> A. Inside the crate, oh, yes, sir.
> Q. What did you see?
> A. Two obvious gun contains, plastic gun containers.

Transcript Draft of Evidentiary Hearing at 25-26, United States v. Scott, Crim. No. 18-49 (September 12, 2019). During further questioning by defense counsel, Detective Hinrichs was asked:

> Q. Despite the fact that it was beyond his wingspan and there was no expressed or articulated concern for safety, officer or public safety at this point, you said you immediately searched the truck, correct?
> A. Once it was moved—nothing was done until the defendant and the vehicle were moved out of the lanes of travel.
> Q. Right.
> A. And then as the Second District officers are with the defendant—
> Q. Correct?
> A. —and I go to check the—search the interior of the vehicle and see—I see very clearly in the backseat where I was informed by Sergeant Bastion that the defendant had placed the object, and I could clearly see. It didn't even take any searching.

Transcript Draft of Evidentiary Hearing at 35-36, United States v. Scott, Crim. No. 18-49 (September 12, 2019). In response to the question "You opened a container that was inside of another container, correct," Detective Hinrichs stated,

I opened an obvious gun container that was inside of a—not a closed container, but a milk crate, an open milk crate, with nothing but one—there was small towel or small t-shirt that was in it. There was nothing stuffed in this other that two gun cases. From that close distance from the doorway, I could see that.

Transcript Draft of Evidentiary Hearing at 36-37, United States v. Scott, Crim. No. 18-49 (September 12, 2019). Based on the officer's more than twenty years of investigating drug-trafficking offenses, he immediately recognized the metal gun cases that sat atop the contents of the milk crate, opened the gun case and found two guns. Detective Hinrichs was further questioned about opening the gun case:

Q. Detective Hinrichs, you said they were obviously gun cases. Why were they obviously gun cases?

A. Just in—from my experience in drug and law enforcement over the years and seeing confiscated—you know, numerous times from search warrants. Yes, I've seen them many times, sir.

Transcript Draft of Evidentiary Hearing at 42, United States v. Scott, Crim. No. 18-49 (September 12, 2019). The law has long distinguished between a warrantless search of a residence and of a vehicle.[89] A vehicle, by its very nature, is transient and evidence contained within subject to loss or removal. The extent to which law enforcement may search within a legally stopped vehicle remains fact-specific.

The United States Supreme Court held in *California v. Acevedo*, 500 U.S. 565 (1991), that the police, in a search extending only to a container within an automobile,

---

[89] *Coolidge v. New Hampshire*, 403 U.S. 443, 459 (1971) (stating that "'a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." (quoting *Carroll v. United States*, 267 U.S. 132, 153 (1925))).

may search the container without a warrant where they have probable cause to believe that it holds contraband or evidence yet lack probable cause to search the entire car: "We therefore interpret *Carroll* as providing one rule to govern all automobile searches. The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."[90] After reviewing the relevant caselaw[91] and hearing testimony, the Court finds the Government established that there was probable cause to believe the milk crate contained contraband or evidence of a crime.

In his testimony during the hearing, Detective Hinrichs, the officer who conducted the investigatory stop of Mr. Scott, testified that he immediately recognized the metal cases as gun cases. He further testified that the gun cases were in plain view, sitting atop the open and uncovered milk crate on the rear passenger seat.[92] Having heard and observed his testimony, the Court finds Detective Hinrichs' testimony to be credible. Further, there was no evidence presented contradicting the officer's testimony regarding the location of the gun cases in plain view.

---

[90] *California v. Acevedo*, 500 U.S. 565, 580 (1991). *See United States v. Ross*, 456 U.S. 798 (1982) (holding that the warrantless search of an automobile under the *Carroll* doctrine could include the search of a container found inside the car when such a search was supported by probable cause, where probable cause was supported by an informant's statement that the defendant had completed a drug transaction using drugs stored in the trunk of the defendant's car).

[91] For a non-exhaustive review, *see California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798 (1982); *United States v. Chadwick*, 433 U.S. 1 (1977), *abrogated by California v. Acevedo*, 500 U.S. 565, 580 (1991); *Arkansas v. Sanders*, 442 U.S. 753 (1979), *abrogated by California v. Acevedo*, 500 U.S. 565, 580 (1991); *Carroll v. United States*, 267 U.S. 132, 153 (1925).

[92] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 25. "I . . . immediately saw on the backseat, a plastic red milk crate that had two gun cases that were obvious there in plain view." *Id.* "I see very clearly in the backseat, where I was informed by Sergeant Bastion that the defendant had placed the object, and I could clearly see. It didn't even take any searching." Transcript Draft of Evidentiary Hearing, *supra* note 6, at 36.

*B. Seizure of the Evidence Following Mr. Scott's Arrest on November 18, 2016.*

Regarding the search incident to arrest, the officers testified, and presented to the Court, a valid arrest warrant for the defendant, Torrey Scott.[93] Upon executing that valid arrest warrant, they conducted a search of Mr. Scott's person and found packs of cocaine and heroin in his front pants pocket.[94] The Court is satisfied that this search of Mr. Scott was pursuant to a lawful arrest and, therefore, is justified.[95]

*C. Securing the Residence While Awaiting the Search Warrant*

As noted above, the Court must consider several factors in deciding whether exigent circumstances exist at the time of a warrantless entry, such as

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic.

*E.g., United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995); *United States v. Vega*, 221 F.3d 789, 800 (5th Cir. 2000) (citing *United States v. Morales*, 171 F.3d 978, 982 (5th Cir. 1999)); *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (citing

---

[93] *See* R. Doc. 70-4.
[94] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48.
[95] *See e.g., Maryland v. King*, 569 U.S. 435, 456 (2013) (stating that "'[t]he standards traditionally governing a search incident to lawful arrest are not . . . commuted to the stricter *Terry* standards.' *Robinson,* 414 U.S., at 234, 94 S.Ct. 467. Nor are these interests in identification served only by a search of the arrestee himself. '[I]nspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity.'"); *United States v. Robinson*, 414 U.S. 218, 226 (1973) (stating that in *Cupp v. Murphy*, 412 U.S. 291, 295 (1973)), "we again reaffirmed the traditional statement of the authority to search incident to a valid arrest.").

*United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993) (quoting *United States v. Thompson*, 700 F. 2d 944, 948 (5th Cir. 1983))).

The testimony from the officers at the hearing reflected that a confidential informant, who had proven his reliability in the past, had provided information that a person by the name of "Torrey" was dealing cocaine and heroin out of a barber shop at 4006 Eden Street.[96] The surveillance conducted at the barber shop appeared to confirm what the information provided by the informant and the investigatory stop of Mr. Scott confirmed his name as "Torrey." That stop led to a lawful arrest, and the search incident to arrest revealed the possession of two guns and approximately $2,000 in Mr. Scott's pants pockets, both further indicators of drug trafficking.[97]

Upon executing the arrest warrant, Mr. Scott, who had just exited the residence, was found with both heroin and cocaine in his pants pocket, further corroboration of the informant's initial tip.[98] After his arrest, Mr. Scott yelled to his female companion to "lock the gate" and to make a call.[99] As the officers testified, the officers were already aware that Mr. Scott had earlier been found in possession of two weapons in his vehicle.[100] Detective Roccaforte testified that he was made aware that the police had recovered drugs from Mr. Scott's person following his arrest.[101] He had also been part of the previous surveillance and was aware of the circumstances of

---

[96] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 3-6.
[97] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 42.
[98] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48.
[99] *Id.*
[100] *See* R. Doc. 70-4.
[101] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48.

that surveillance.[102] Detective Roccaforte testified, "Based on that, when I noticed the female was inside the gate, and based on the information that the officers told me that Mr. Scott was trying to relate to the female, I felt at that point that we needed to secure the residence."[103]

The Court looks to the immediate circumstances of the arrest and beyond. The Court considers the facts that had previously been acquired by the officers, including the information from the reliable confidential informant, the previous surveillance, as well as the stop of Mr. Scott when the guns were found in the vehicle. These circumstances, viewed in their totality, lead the Court to conclude that it was reasonable for the officers on the scene to believe that there could be weapons inside the residence. Further, since Mr. Scott had yelled to his companion to lock the gate and make a call, it was reasonable for the officers to believe that the companion might take steps to destroy any contraband within the residence.[104] Although the officers could have secured the outside of the residence while awaiting a search warrant, this action would not have protected the officers from anyone inside who may have had access to weapons to cause harm to them from within or from someone inside the residence to destroy any contraband. Further, because of the previous stop, the officers were aware that the defendant had access to weapons. The testimony revealed, without any contradiction, that the officers entered the home initially without a warrant only to secure it and to confirm that no other individuals who could

---

[102] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48-49, 54-58.
[103] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 49.
[104] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 48-49.

cause harm, either to the officers or to any contraband that might be within the residence, were inside.[105] Once the home was secured, which they testified took only a matter of minutes, the officers then sought and obtained a search warrant before conducting any search.[106] In response to the question by defense counsel:

> Q. [H]ow long were you inside of 7200 Washington Avenue without a search warrant, inside the dwelling?
> A. I would say—it took us—it's not a real, real large structure. One story. I want to say we were in there for a minute, minute and a half, ensuring no one else was inside. But no more than that.

Transcript Draft of Evidentiary Hearing at 61, United States v. Scott, Crim. No. 18-49 (September 12, 2019).

After considering the factors listed in *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995), the Court finds that it was reasonable for the officers in that situation to believe that contraband was contained in the residence which might be destroyed or removed. The Court is further persuaded that exigent circumstances existed to allow a warrantless entry of the residence to secure the home while the officers obtained a search warrant. In addition, the Court finds that this initial warrantless entry did not result in any confiscation of evidence until the search warrant was signed and returned to the scene.

Further, Detective Roccaforte testified that, upon return with the signed search warrant, it was Mr. Scott who indicated that he wanted to point out where the

---

[105] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 49-50.
[106] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 50, 63.

evidence was located, and, in fact, he did.[107] The Court is further satisfied that the evidence seized within the residence was thereafter seized pursuant to a valid search warrant.

Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Evidence (R. Doc. 47) is DENIED.

New Orleans, Louisiana, this 25th day of September, 2019.


_____
WENDY B. VITTER
UNITED STATES DISTRICT JUDGE

---

[107] Transcript Draft of Evidentiary Hearing, *supra* note 6, at 52.